UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MICHAEL N. BARNES

                Plaintiff,

v.

MICHAEL J. ASTRUE, COMMISSIONER
SOCIAL SECURITY ADMINISTRATION

                Defendant.

---

**REPORT AND
RECOMMENDATION**

1:11-CV-00036(A)(M)

## INTRODUCTION

This case was referred to me by Hon. Richard J. Arcara to hear and report in accordance with 28 U.S.C. §636(b)(1)(B) [21][1].  Before me are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. ("Rule") 12(c) [26, 28].  For the following reasons, I recommend that defendant's motion be denied, and that plaintiff's cross motion be granted in part and denied in part.

## PROCEDURAL BACKGROUND

Plaintiff filed an initial application for Supplemental Security Income ("SSI") benefits, which were awarded on July 18, 1996 (T405).[2]  The benefits were awarded due to a "severe learning disability and personality disorder" which met "the requirements of Listing 12.05 C, Appendix 1, Subpart P, Regulations No. 4" (T407).  However, the benefits were

---

[1]      Bracketed references are to the CM/ECF docket entries

[2]      References to "T" are to the certified transcript of the administrative record.

terminated in 2002 as a result of plaintiff engaging in substantial gainful activity.  Plaintiff's

Memorandum of Law [28-1], p. 7.[3]

Plaintiff filed a second application for SSI and Disability Insurance Benefits

("DIB") on October 3, 2006, alleging that he was unable to work since June 1, 2006 (T16).  Both

applications were denied (T67).  Plaintiff requested a hearing, which took place on February 4,

2009 before Administrative Law Judge ("ALJ") Bruce R. Mazzarella. (T24-62).  Plaintiff was

represented by Dennis Gaughan, Esq.  Id.  On March 9, 2009, ALJ Mazzarella issued a decision

finding that plaintiff was not under a disability within the meaning of the Social Security Act

from the alleged onset date through the date of the decision (T16-23).  This became the final

decision of the Commissioner on March 12, 2010, when the Appeals Council denied plaintiff's

request for review (T1-5).  This action followed.


### THE ADMINISTRATIVE RECORD

Plaintiff sought SSI and DIB due to a "learning disability, bipolar, depression,

suicidal, BACK AND NECK PROBLEMS, [and] ANGER ISSUES" (T134) (emphasis in

original).

---

[3]     Since plaintiff's Memorandum of Law is not paginated, I have referred to the CM/ECF
numbering.

**A.    Medical Evidence Preceding the Relevant Period of Review[4]**

Plaintiff submitted evidence of his previous application for SSI, including that his performance IQ was measured to be 70 on the Wechsler Adult Intelligence Scale administered on October 31, 1994 (T372).

On March 10, 2006, plaintiff was transferred to Erie County Medical Center ("ECMC") from St. Joseph's Hospital for evaluation (T209-219).  He was at St. Joseph's due to a minor stab wound which he self-inflicted in response to a disagreement with his girlfriend (T217).  He was diagnosed with adjustment disorder and mild mental retardation (T218).  The attending physician assessed plaintiff as having a Global Assessment of Functioning ("GAF") score of 41-50,[5] and referred plaintiff to out-patient mental health counseling.  Id.

**B.    Medical Evidence During the Relevant Period of Review**

**1.    Mental Conditions and Treatment**

On July 31, 2006, Christopher Frigon, a Licensed Master Social Worker at Hertel Elmwood Counseling Center's ("HECC"), completed a screening assessment diagnosing plaintiff with a depressive disorder not otherwise specified ("NOS"), alcohol abuse, and a learning disorder NOS. (T227).  At this time, plaintiff was assessed with a GAF score of 55.[6]  Id.

---

[4]    The relevant period of review is from June 1, 2006 through March 9, 2009 (T22-23).

[5]    "[A] GAF score of 41-50 denotes serious symptoms or any serious impairment in social, occupational, or school functioning."  Hill v. Astrue, 2012 WL 2178925, *3 (N.D.N.Y. 2012) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 2000) (DSM-IV-TR)).

[6]    "A GAF between 51 and 60 indicated 'moderate symptoms OR moderate difficulty in social, occupational, or school functioning.'" Kohler v. Astrue, 546 F.3d 260, 262 n. 1 (2d Cir. 2008) (emphasis in original) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of

On September 21, 2006, plaintiff underwent a comprehensive behavioral health assessment administered by John Vullo, a Licensed Mental Health Counselor at Horizon Corporation's Bailey Kensington Counseling Center ("BKCC") (T269-91).  Plaintiff reported an inability to keep a job for longer than two months, which he attributed to his temper (T269).  He reported being classified as learning disabled and emotionally disturbed.  Id.  Plaintiff also complained of back and neck problems, along with a history of mild scoliosis.  Id.  Plaintiff reported that he has "bile leaking from [my] liver, severe acid reflux, and just all this mental stress going on" (T275).  He stated that he "does not feel he can work but needs money to pay bills" (T269).  Plaintiff denied current suicidal or homicidal thoughts (T270).  At the time of the assessment he was not on medication, but had previously been prescribed Zoloft, which he no longer used because it was ineffective.  Id.

Plaintiff was expelled from school in ninth grade for fighting (self-defense) and for threatening administrators (T282).  Counselor Vullo was "unsure about the severity of the diagnoses of [learning disabled]" Id.  Counselor Vullo noted several potential barriers to plaintiff's treatment, including limited intellectual functioning, limited education, learning difficulties, being socially withdrawn, and difficulties with interpersonal relationships (T285).  He noted that plaintiff's current employment status was disabled, and that he was "[u]nable to hold a job for more than several months, is released for becoming angry at the supervisor, and will sometimes threaten assault" (T283).  Plaintiff's initial treatment plan included individual and group counseling, psychiatric and medical evaluations, and referral to a vocational program (T286).

---

Mental Disorders, 32 (4th ed. 2000) (DSM-IV-TR)).

On October 5, 2006, Psychiatric Nurse Practitioner Adrienne Roy conducted a psychiatric assessment for Horizon (T262-66). Plaintiff reported being more irritable and easily provoked then ever, and "[f]eels that as time does on he is more likely to hurt someone" (T262). She noted his disheveled appearance, irritable and anxious mood, circumstantial and tangential though processes, referential and paranoid delusions, and poor concentration, insight, judgment and poor sleep (T263-64). Nurse Roy determined plaintiff had "lower than average intelligence" and "[p]oor impulse control" (T264). She diagnosed plaintiff with depressive disorder NOS, intermittent explosive disorder, alcohol abuse, and learning disorder NOS (T267). Nurse Roy prescribed Zyprexa to address anxiety, sleep issues, paranoia, and mood instability (T265).

On October 19, 2006, Nurse Roy reported that plaintiff's mood had not improved on Zyprexa, but that it had improved his sleep (T259). Nurse Roy stated that plaintiff did not appear to be a risk to himself or others. Id. She increased his Zyprexa dosage and advised a follow-up appointment in four weeks. Id.

On January 4, 2007, plaintiff reported to Nurse Roy that his mood was "'up and down and miserable'" (T254). He stated that he feels taken advantage of, has continued "ideas of reference",[7] and complained of losing jobs due to his temper and inability to learn. Id. Plaintiff denied that he would continue treatment if he was awarded benefits. Id. Plaintiff again denied being a threat to himself or others. Id. Nurse Roy recommended that plaintiff take parenting classes, and that he not live alone with his baby "in the near future" due to his unpredictable

---

[7]     "Idea of reference" is the misinterpretation that other people's statements or acts or neutral objects in the environment are directed towards one's self, when in fact, they are not. Stedman's Medical Dictionary, p. 872 (27th ed. 2000).

temper, poor impulse control, history of violence, and paranoia (T255).  She again prescribed Zyprexa.  Id.

        Nurse Roy wrote two letters to plaintiff's attorney on January 11 and March 28, 2007 (T295, 422).  In the first letter, Nurse Roy stated plaintiff is being "treated for Depressive Disorder Not Otherwise Specified, Intermittent Explosive Disorder NOS, and Learning Disorder Not Otherwise Specified (by history, including a provisional diagnoses of Borderline Intellectual Functioning)" (T295).  She further stated that plaintiff "has not had a proper trial of mood stabilizer/anti-psychotic medication due to missed appointments.  It is not recommended that [plaintiff] work at present, given his reported poor work history and unpredictable impulse control.  It is hoped that if [plaintiff] continues to comply with his medication regimen, and with assistance of a vocational rehabilitation program, his symptoms will improve, thus increasing his chances of success at employment."  Id.  However, in the second letter Nurse Roy wrote that "[i]t is . . . not recommended that [plaintiff] work given his anger and impulse control problems, poor insight and judgment, and difficulty initiating and sustaining change" (T422).  The second letter was also signed by Counselor Vullo.  Id.

        At the recommendation of his counselor and his attorney, plaintiff was treated at ECMC on April 24, 2007 (T336).  He reported being fired from his job of three weeks due to an "anxiety attack."  Id.  Plaintiff stated he was depressed, had poor coping skills, and difficulty controlling his temper.  Id.  He denied suicidal or homicidal thoughts, as well as current panic or anxiety.  Id.  Plaintiff admitted not taking Zyprexa because it "makes [him] dopey" (T340).  His mental status examination showed coherent speech, goal oriented thought processes, fair insight and judgment, and an absence of hallucinations and delusions (T342).  Plaintiff was diagnosed

with "mood [disorder] NOS [to be ruled out], intermittent explosive [disorder], [and] depression NOS" (T343).  He was assessed to have a GAF score of 51-60.  Id.  The treatment plan included a Comprehensive Psychiatric Emergency Program ("CPEP") evaluation and a lethality assessment.  Id.  Outpatient mental health treatment was recommended (T343-344).

On August 1, 2007, Horizon's BKCC transferred plaintiff's case to the HECC, which was closer to his home, due to his missing three appointments and being "noncompliant with treatment" (T359).  Plaintiff was discharged from HECC on August 29, 2007, after he stopped attending sessions (T349).  On September 11, 2007, plaintiff "spoke with his primary counselor and stated he no longer wanted to participate in treatment due to the fact that he does not feel he needs addictions treatment and his lack of time for treatment."  Id.  Upon discharge plaintiff was assessed to have a GAF score of 55 (T348).

On April 22, 2008, an initial psychiatric assessment was administered by Dr. Cirpili of Horizon Health Services (T363).[8]   Plaintiff complained that he was unable to control his impulsivity.  Id.  Dr. Cirpili found that plaintiff was "not psychotic and is able to know right from wrong and was able to know the consequences of his actions."  Id.  Dr. Cirpili diagnosed plaintiff with impulse control disorder, anti-social trends, and financial and social problems.  Id. He was assessed to have a GAF score of 57.  Id.  Plaintiff was directed to "attend Horizon clinic for further followup."  Id.

On June 23, 2008, plaintiff was discharged from HECC because he "was not appropriate for treatment at this agency" (T364).  He requested information on other mental health service providers, which he received (T366).

---

[8]        Dr. Cirpili's first name does not appear in the record.

2.      **Consultative Mental Examinations**

On January 31, 2007, a consultative psychiatric evaluation was conduct by

Thomas Ryan, Ph.D. (T301-04).  Plaintiff reported problems with his back and neck, as well as

history of asthma (T301).  He further stated he had difficulty with sleep, a varying appetite,

depression, irritability, stress, anxiety, and social withdrawal.  Id.  Plaintiff reported having hyper

startle response, but not panic attacks, as well as past thoughts of self-harm, which he denied

currently.  Id.  He further reported difficulty with memory, attention, and concentration, but no

manic symptomatology.  Id.  Plaintiff stated that he is able to dress, bathe, and groom himself, as

well as cook, clean, do laundry, and manage his money (T303).  Throughout the mental

examination plaintiff was cooperative and his social skills and overall presentation were

adequate.  Id.  His recent and remote memory skills were mildly impaired, and his cognitive

functioning was "[e]stimated to be in the borderline range."  Id.  Plaintiff's insight and judgment

"[a]ppear[ed] to be somewhat poor."  Id.

Dr. Ryan diagnosed plaintiff with depressive disorder NOS, impulse control

disorder NOS, and reported suspected borderline intellectual functioning (T304).  Also diagnosed

were neck and back problems.  Id.  Dr. Ryan recommended that he continue psychological and

psychiatric treatment, he also stated that vocational training and intelligence testing may be

helpful.  Id.  Despite these impairments, Dr. Ryan concluded that plaintiff can follow and

understand simple directions, perform simple tasks, and maintain attention, concentration and a

regular schedule (T303).  He found plaintiff capable of learning new tasks, but noted that he

"would have some difficulty with complex tasks".  Id.  Dr. Ryan also stated that plaintiff's

"[d]ecision making is somewhat poor", and that "[h]e tends to have some difficulties dealing

with others and dealing with stress".  Id.  He concluded that the "[r]esults of the exam appear

consistent with psychiatric and possibly cognitive problems which may interfere to some degree

on a daily basis".  Id.

On March 6, 2007, State agency medical consultant M. Mohan, Ph.D. completed a

Psychiatric Review Technique and a Mental Residual Functioning Capacity assessment (T311-

328).  Dr. Mohan reported that plaintiff had mild limitations that restricted his activities of daily

living, as well as his ability to maintain concentration, persistence, and pace (T321).  Plaintiff

had moderate limitations in social functioning, but no episodes of deterioration of extended

duration.  Id.  However, Dr. Mohan concluded that plaintiff did not have an impairment that met

or equaled Listings 12.04 or 12.08 (T311-18).  Dr. Mohan concluded that plaintiff "should be

capable of simple, low contact work" (T323).

### 3.      Physical Conditions and Treatment

An August 21, 2006, x-ray of plaintiff's left hand revealed a "fracture of the 5th

metacarpal" with angulation, but no significant displacement (T250-51).[9]  Paul J. Lapoint, D.O.,

indicated the x-ray showed the fracture to be healed, and that plaintiff would return to work on

September 5, 2006.  Id.

---

[9]      "Metacarpal": five long b[ones] (numbered I to V, beginning with the b[one] on the
radial or thumb side) forming the skeleton of the metacarpus or palm".  Stedman's Medical Dictionary, p.
224 (27th ed. 2000).

### 4.      Consultative Internal Medicine Examination

On January 31, 2007, a consultative internal medicine examination was conducted by Nikita Dave, M.D. (T296-99).  Plaintiff complained of asthma triggered by physical exertion such as running less than one block, carrying, lifting, and climbing stairs (T296).  He stated that he does not use his inhaler because he does not have medical insurance, but that he is generally fine without it so long as he avoids triggering activities.  Id.  Plaintiff stated he can cook, clean, do laundry, go shopping, shower, bathe, and dress independently.  Id.  His past medical history revealed a fracture of the right scapula two years ago, and a fracture of the fifth metacarpal in 2006.  Id.  Surgery was not performed on either occasion, although it was recommended on the fifth metacarpal.  Id.

The physical examination was normal in all respects except that plaintiff had pain and reduced range of motion in his right shoulder (T298).  A lumbar spine x-ray was normal (T298, 300).  Dr. Dave's diagnoses included depression, anxiety, recent suicidal ideation, and asthma (T298).  Dr. Dave concluded that plaintiff "does not have any limitations based on the physical evaluation", but "should avoid dust, smoke, fumes, and inhalants."  Id.  Dr. Dave also determined that "[b]ased on his asthma history, mild to moderate restriction for heavy endurance activities repetitive stair climbing, heavy lifting, carrying activities."  Id.

### C.      Administrative Hearing Conducted on February 4, 2009

Plaintiff stated that he has held at least thirteen jobs in the past couple of years, with at least one lasting only three weeks (T50, 55).  He testified that his work history includes janitorial work from 2000 to 2001; carpet cleaning from March 2002 to October 2002;

construction/paving from April 2004 to November 2005; dishwashing from February 2006 to

April 2006; construction from April to June of 2006; and paving in 2008 (T33-34).  Plaintiff

further testified he has trouble remembering and following orders, which has led to an inability to

sustain employment.  Id.  He also has difficulty keeping pace with the demands of employers and

does not deal well with criticism from supervisors or co-workers (T39-40).  He has been

involved in at least one physical confrontation at work where he "punched someone out" for

swinging a tree branch at him (T41).  Plaintiff also testified "I feel like I was forced to work

because like all these people kept on saying you know you should work, you need a job, blah,

blah blah.  That's the only reason I attempted to try to work" (T35).

      Jay Steinbrenner, a vocational expert ("VE"), testified at the hearing (T55).  ALJ

Mazzarella posed a hypothetical to VE Steinbrenner, who was to assume an individual with

plaintiff's mental traits and vocational profile, including a "marginal education"[10] (T58).  This

hypothetical individual had no exertional limits and should avoid unventilated work

environments with high concentrations of dust, fumes, gasses, or vapors (T59).  The individual

was limited to simple, routine, and repetitive task.  Id.  VE Steinbrenner testified that this

individual would be able to perform the plaintiff's previous occupations of dishwasher,

"construction worker II", and dump truck driver, all unskilled occupations.  Id.

      ALJ Mazzarella then asked VE Steinbrenner to assess two additional

hypotheticals.  The second was the same as the first, except the individual was assumed to have a

marked limitation in socialization with a marked limitation in dealing with the general public,

---

[10]    "Marginal education" runs from third to sixth (T58).  Plaintiff has a ninth-grade
education in special education classes, and attended tractor trailer school where he obtained his
commercial driver's license (T37).  He has taken the GED six time, but never passed (T21).

supervisors, and fellow workers.  Id.  VE Steinbrenner testified that this individual would still be

able to secure employment as a dishwasher, construction worker, and dump truck driver (T60).

However, he testified that with a marked limitation in dealing with supervisors, the employment

would be unsustainable.  Id.  He further stated that an unskilled laborer who is consistently a

problem would be replaced quickly.  Id.

The third hypothetical was the same as the first, except this individual was

assumed to have a marked limitation in concentration, persistence, and pace on simple,

repetitive, and routine tasks (T61).  VE Steinbrenner testified that the outcome in this scenario

would be very similar to the second situation; employment could be obtained, but would be

unsustainable due to an inability to "work efficiently enough" for the employer.  Id.


D.     **ALJ Mazzarella's March 9, 2009 Decision**

ALJ Mazzarella made the following findings in connection with plaintiff's

application: (1) plaintiff has not engaged in substantial gainful activity since June 1, 2006, the

alleged onset date (T18); (2) plaintiff has the following severe impairments: borderline IQ,

depressive disorder/explosive anger disorder, learning disability, and asthma (id.); (3) plaintiff

does not have an impairment or combination of impairments that meets of medically equals one

of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (T19); (4) plaintiff has

the residual functional capacity ("RFC") to perform a full range of work at all exertional levels

but with the following non-exertional limitations: should not work in unventilated work areas,

and is limited to simple, repetitive, and routine tasks in a low contact, low stress work

environment (T20); (5) plaintiff is capable of performing past relevant work as a "dishwasher,

construction worker II, and dump truck driver" (T22); and (6) plaintiff has not been under

disability from June 1, 2006 through the date of the opinion.  Id.


# ANALYSIS

A.      **Scope of Judicial Review**

The Social Security Act states that, upon review of the Commissioner's decision

by the district court, "the findings of the Commissioner...as to any fact, if supported by

substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).  Substantial evidence is that

which a "reasonable mind might accept as adequate to support a conclusion".  Consolidated

Edison Co. of New York, Inc. v. NLRB, 305 U.S. 197, 229 (1938).

Under this standard, the scope of judicial review of the Commissioner's decision

is limited.  This Court may not try the case de novo, nor substitute its findings for those of the

Commissioner.  See Townley v. Heckler, 748 F. 2d 109, 112 (2d Cir. 1984).  Rather, the

Commissioner's decision is only set aside when it is based on legal error or is not supported by

substantial evidence in the record as a whole.  See Balsamo v. Chater, 142 F. 3d 75, 79 (2d Cir.

1998).  If supported by substantial evidence, the Commissioner's finding must be sustained

"even where substantial evidence may support the plaintiff's position and despite that the Court's

independent analysis of the evidence may differ" from that of the Commissioner.  Martin v.

Shalala, 1995 WL 222059, *5 (W.D.N.Y. 1995) (Skretny, J.).

However, before deciding whether the Commissioner's determination is

supported by substantial evidence, the court must first determine "whether the Commissioner

applied the correct legal standard".  <u>Tejada v. Apfel</u>, 167 F. 3d 770, 773 (2d Cir. 1999).  "Failure

to apply the correct legal standards is grounds for reversal."  <u>Townley</u>, 748 F. 2d at 112.


**B.      The Disability Standard**

The Social Security Act provides that a claimant will be deemed to be disabled "if

he is unable to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which . . . has lasted or can be expected to last for a continuous

period of not less than twelve months."  42 U.S.C. §1382c(a)(3)(A).  The impairments must be

"of such severity that he is not only unable to do his previous work but cannot, considering his

age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy".  42 U.S.C. §1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

"1.      The Commissioner considers whether the claimant is currently engaged in
          substantial gainful activity.

2.       If not, the Commissioner considers whether the claimant has a 'severe
          impairment' which limits his or her mental or physical ability to do basic
          work activities.

3.       If the claimant has a 'severe impairment,' the Commissioner must ask
          whether, based solely on medical evidence, claimant has an impairment
          listed in Appendix 1 of the regulations.  If the claimant has one of these
          enumerated impairments, the Commissioner will automatically consider
          him disabled, without considering vocations factors such as age,
          education, and work experience.

4.       If the impairment is not 'listed' in the regulations, the Commissioner then
          asks whether, despite the claimant's severe impairment, he or she has
          residual functional capacity [("RFC")]to perform his or her past work.

-14-

5.      If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.  The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps."

Shaw v. Chater, 221 F. 3d 126, 132 (2d Cir. 2000).  See C.F.R. §§ 404.1520, 416.920.

The "regulations . . . limit the Commissioner's burden at step five.  See 20 C.F.R. 404.1560(c) . . . The Commissioner's step-four RFC determination (with the claimant bearing the burden of proof) now controls at both steps four and five. . . .  The Commissioner applies the RFC determination from step four to meet his burden at step five.  Using the claimant's RFC, the Commissioner must then show at step five that 'there is other gainful work in the national economy which the claimant could perform.'" Spain v. Astrue, 2009 WL 4110294, *3 (E.D.N.Y. 2009).

Plaintiff challenges the denial of benefits on several grounds including: that ALJ Mazzarella (1) erred by "arbitrarily dismissing all substantial evidence and using the IME Psychiatrist's opinion as the sole reason for making an unfavorable decision . . . [and] in arbitrarily dismissing all substantial evidence of non-medical sources of longitudinal and credible evaluations of his mental, emotional and intellectual disabilities" (plaintiff's Memorandum of Law [28-1], pp. 2-4)[11]; (2) "err[ed] in the substance of his posed hypotheticals to the Vocational Expert and deliberately ignor[ed] the Vocational Expert's testimony during the hearing" (id., pp. 5-6); (3) "err[ed] in summarily dismissing the previous decision for total and permanent disability" (id., pp. 7-8); (4) that the Commissioner erred in not finding that plaintiff met one of

_____

[11]      Plaintiff's Memorandum of Law [28-1] is not paginated.  My citations are to the CM/ECF numbering.

-15-

the listed impairments (id., p. 9); and (5) "err[ed] in ascertaining that the Plaintiff could perform

past relevant work and in declaring his residual functional capacity to perform work at all

exertional levels with non-exertional limitations" (id., p. 10).  I will address these arguments

individually.


**C.      ALJ Mazzarella Erred in Summarily Dismissing Nurse Roy's Assessment**

Plaintiff argues that the Commissioner erred in "arbitrarily dismissing all

substantial evidence and using the IME Psychiatrist's opinion as the sole reason for making an

unfavorable decision . . . [and] in arbitrarily dismissing all substantial evidence of non-medical

sources of longitudinal and credible evaluations of his mental, emotional and intellectual

disabilities".  Plaintiff's Memorandum of Law [28-1], pp. 2-4.  Plaintiff also argues that ALJ

Mazzarella failed to adhere to Social Security Ruling ("SSR") 06-03p.[12]  Id.  The Commissioner

responds that "the ALJ properly considered the opinions of NP Roy and, specifically citing SSR

06-03p, correctly noted that NP Roy was not an acceptable medical source, whose opinion that

Plaintiff could not work was not entitled to any special weight."  Commissioner's Reply

Memorandum of Law [29], p. 2. He further argues that Nurse Roy's "recommendations that

Plaintiff not work . . . are statements which are opinions on an issue reserved to the

Commissioner, and cannot be given special significance." Id., p. 3.

---

[12]      SSA's Policy Interpretation Ruling SSR 06-03p: Considering Opinions and Other
Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering
Decisions on Disability by Other Governmental and Nongovernmental agencies.  SSR 06-03P, 2006 WL
2329939, *1 (S.S.A.).

I disagree with plaintiff's assertion that it would be improper for ALJ Mazzarella to rely solely on Dr. Ryan's opinion.  "State agency medical consultants are qualified experts in the evaluation of disability claims and, as such, their opinions may constitute substantial evidence if they are consistent with the record as a whole."  Swan v. Astrue, 2010 WL 3211049, *5 (W.D.N.Y. 2010) (Telesca, J.) (citing Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983)).  Nevertheless, in doing so, it was improper for him to summarily reject Nurse Roy's assessment.  Plaintiff's Memorandum of Law [28-1], p. 3.

Here, ALJ Mazzarella noted Nurse Roy's January 11, 2007 recommendation that plaintiff was unable to work at that time, but concluded that it was not entitled to controlling weight since she "is not a medical doctor" and "[b]ased upon the consultative examination, not much weight is afforded this opinion as opposed to the expert opinion of the consultative examiner" (T22).

Although nurse practitioners are not considered "acceptable medical sources",  20 C.F.R. §404.1513(a), they are considered "other sources".  20 C.F.R. §404.1513(d).  See Hamilton v. Astrue, 2013 WL 5474210, *12 (W.D.N.Y. 2013) (Payson, M.J.).  According to SSR 06–03p, opinions from "other sources" "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  2006 WL 2329939, *3.  "While the opinion[s] [of other sources] do[] not command the same weight as a physician's, [they are] nevertheless entitled to some consideration." Marziliano v. Sullivan,  771 F.Supp. 69, 75 (S.D.N.Y. 1991).

Thus, "[w]hile the Commissioner is . . . free to decide that the opinions of  'other sources,' including nurse practitioners . . . are entitled to no weight or little weight, those

decisions should be explained." <u>Sears v. Astrue</u>, 2012 WL 1758843, *3 (D.Vt. 2012).  In

evaluating the opinions of "other sources", "SSR 06–03p directs the Commissioner to use the

same factors . . . as are used to evaluate the opinions of 'acceptable medical sources,' including

treating physicians . . . . These factors include but are not limited to the length of the treatment

relationship, the frequency of evaluation, and the degree to which the opinion is supported and

consistent with the record." <u>Id</u>. (<i>citing</i>  2006 WL 2329939 at *4).  In fact, "[b]ased on the

particular facts of a case, such as length of treatment, it may be appropriate for an ALJ to give

more weight to a non-acceptable medical source than a treating physician." <u>Anderson v. Astrue</u>,

2009 WL 2824584, *9 (E.D.N.Y. 2009).

   I recognize that the ALJ has the discretion to "'choose between properly

submitted medical opinions'" <u>Balsamo</u>, 142 F.3d at 81.  <i>See</i> <u>Veino v. Barnhardt</u>, 312 F.3d 578,

588 (2d Cir. 2002).  However, this decision should be explained.  <i>See</i> <u>Sears</u>, 2012 WL 1758843

at *3.  <i>See</i>  <u>Colon v. Astrue</u>,  2013 WL 2245457, *10-11 (W.D.N.Y. 2013) (Arcara, J./McCarthy,

M.J.). It was an abuse of discretion for ALJ Mazzarella to summarily discount Nurse Roy's

assessment of the severity of plaintiff's limitations  in favor of  the consultative examiner's

opinion solely because she is a nurse, especially given her repeated treatment of plaintiff.  <i>See</i>

<u>Anderson</u>, 2009 WL 2824584 at *9.

   Since VE Steinbrenner testified that an individual with a marked limitation in

dealing with supervisors would not be able to sustain employment (T60) and given plaintiff's

history of not being able to sustain employment, the impact of plaintiff's anger and impulse

control issues on his  ability to sustain employment is critical. Yet, in addition to summarily

discounting Nurse Roy's assessment of the severity of plaintiff's anger and impulse control

issues as precluding employment, ALJ Mazzarella's opinion ignores Nurse Roy's and Counselor

Vullo's subsequent March 2007 letter recommending that plaintiff not work "given anger and

impulse control problems, poor insight and judgment, and difficulty initiating and sustaining

change" (T422).

    While I agree with the Commissioner (Commissioner's Reply Memorandum of

Law [29], p. 3) that Nurse Roy's conclusion that  plaintiff is disabled  is an opinion reserved for

the Commissioner (*see* <u>Hach v. Astrue</u>,  2010 WL 1169926, *10 (E.D.N.Y. 2010)), I disagree

with the Commissioner that this precludes consideration of Nurse Roy's assessment of the

severity of plaintiff's limitations.  "[A]n ALJ may consider opinions from medical sources on

issues reserved to the Commissioner, such as the nature and severity of an impairment".  <u>Gomez</u>

<u>v. Astrue</u>, 722 F.Supp.2d 389, 393 (S.D.N.Y. 2010).

    Therefore, I recommend that this case be remanded for the Commissioner to make

findings regarding the weight to be assigned to Nurse Roy's January 11 and March 28, 2007

assessments (T295, 422) and to analyze step five of the sequential evaluation process in light of

any changes made to the weight afforded to these assessments upon remand.


**D.**  **ALJ Mazzarella's RFC Assessment was Proper**

    Plaintiff argues "[t]he Commissioner is correct in ascertaining that the Plaintiff

could perform past relevant work.  However the error is in the ALJ's finding that the Plaintiff's

residual function capacity (RFC) to perform all exertional levels must be qualified and the

correct RFC should be to perform all exertional levels of **<u>unskilled</u>** work with mild non-

exertional limitations."  Plaintiff's Memorandum of Law [28-1], p. 10 (emphasis in original).

The Commissioner responds that "the ALJ found Plaintiff was able to do his past work of dump truck driver, construction worker, and dishwasher, all of which are categorized as

unskilled   work . . . Consequently . . . Plaintiff's argument offers no basis to disturb the Commissioner's decision".  Commissioner's Reply Memorandum of Law [29], p. 8.  I agree with the Commissioner.

ALJ Mazzarella assessed plaintiff to have the following RFC: "claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: should not work in unventilated work areas containing high concentrations of dust, fumes, gasses and vapors.  The claimant is limited to simple repetitive and routine tasks in a low contact low stress work environment" (T20).  Although ALJ Mazzarella did not expressly limit plaintiff's RFC to "unskilled" employment, any failure to expressly limit the RFC to unskilled work is inconsequential, as ALJ Mazzarella concluded that plaintiff could perform his past relevant work, which is characterized as unskilled (T22, 57). Therefore, I recommend that the case not be remanded on this basis.


**E.     ALJ Mazzarella Properly Considered VE Steinbrenner's Testimony**

Plaintiff argues that ALJ Mazzarella erred since  "[i]t is obvious that the substance of the ALJ's posed hypotheticals adequately addressed the Plaintiff's limitations but then the ALJ chose to totally disregard the VE's expert opinion."  Plaintiff's Memorandum of Law

[28-1], pp. 5-6.  The Commissioner responds that "[o]ne of the[] hypothetical individuals

[presented to VE Steinbrenner] had an RFC that matched the RFC that the ALJ assessed for

Plaintiff" and that plaintiff misunderstands the role of the VE whose testimony has no bearing on

the RFC determination.  Commissioner's Reply Memorandum of Law [29], pp. 4-5.

ALJ Mazzarella presented three hypotheticals to VE Steinbrenner during the

administrative hearing:

> (1) Individual with vocational profile of plaintiff, no exertional limitations, individual
> should avoid unventilated work environments containing high concentration of dust,
> fumes, gasses, and vapors, limited to simple, repetitive, and routine tasks in a low contact
> and low stress work environment (T59).
>
> (2) Same as (1) plus: individual has a marked limitation in socialization with a marked
> limitation in dealing with the general public, supervisors, and fellow workers.  Id.
>
> (3) Same as (1) plus: individual has a marked limitation in concentration, persistence, and
> pace on simple, repetitive, and routine tasks (T61).

VE Steinbrenner testified that an individual with the limitations identified in the first

hypothetical could work as a dishwasher, construction worker, or dump truck driver (T59).[13]  In

response to hypothetical (2) and (3) VE Steinbrenner testified that the individual would be able to

obtain employment but would have difficulty sustaining it due to conflicts with supervisors and

an inability to work fast enough (T59-61).

"The RFC findings contained in the decision must match the hypothetical posed to

the expert." Owens v. Astrue, 2009 WL 3698418, *8 (N.D.N.Y. 2009).  While plaintiff may not

agree with the Commissioner as to which hypothetical RFC presented to VE Steinbrenner

matched his limitations, it cannot be said that ALJ Mazzarella "disregarded" VE Steinbrenner's

---

[13]     Unlike the other hypotheticals, ALJ Mazzarella did not ask VE Steinbrenner about the
sustainability of employment under this hypothetical (T59).

testimony.[14]  Instead, he merely elected to rely on VE Steinbrenner's testimony concerning the

first hypothetical, which matched the RFC he determined for plaintiff.  Therefore, I recommend

that the case not be remanded on this basis.


**F.      The Commissioner Did Not Err In Dismissing The Previous Favorable Decision**

Plaintiff argues that the Commissioner erred in "summarily dismissing the

previous decision for total and permanent disability and finding the sole reason for cessation of

benefits was due to the Plaintiff attempting to adequately support himself and his children at

more than poverty level."[15]  Plaintiff's Memorandum of Law [28-1], pp. 7-8.  The Commissioner

responds that while  "plaintiff's previous favorable application is not at issue in this case", in

considering plaintiff's current application, ALJ Mazzarella "considered Plaintiff's previous

favorable application and his work history".  Commissioner's Reply Memorandum of Law [29],

p. 6.

Plaintiff was previously awarded SSI benefits on July 18, 1996 (T405).  The

benefits were awarded due to a severe learning disability and personality disorder which met the

requirements of Listing 12.05(c), Appendix 1, Subpart P, Regulations No. 4 (mental retardation).

Id.  "To satisfy listing 12.05(c), [a claimant]  must demonstrate he suffers from '[a] valid verbal,

performance, or full scale IQ of 60 through 70 and a physical or other mental impairment

---

[14]      Plaintiff fails to identify which of the three hypotheticals should have been applied to
him.

[15]      Although plaintiff's argument here is unclear, I interpret it as an assertion that the
previous favorable decision should have been controlling in this case.  In other words, since Plaintiff fell
under Listing 12.05 in 1996, he asserts that he should have again received benefits by falling under the
same Listing.

imposing an additional and significant work-related limitation of function.'" Lawler v. Astrue,

2012 WL 177956, *1 (N.D.N.Y. 2012) (*quoting* 20 C.F.R. pt. 404, subpt. P, app. 1 §12.05©).

These benefits were terminated in 2002 due to plaintiff participating in substantial gainful

activity.[16]

       In denying plaintiff's current application, ALJ Mazzarella acknowledged the 1994

measurement of plaintiff's IQ as being 70 (T372), which was critical to the previous

determination that he met Listing 12.05(c), but discounted it "based upon school records . . . and

his actual performance of skilled and semi-skilled work, this is an under-evaluation of his actual

borderline performance" (T21-22).

       "A claimant cannot satisfy subsections 12.05(B)-(D) if the ALJ properly

determines that the claimant's IQ scores are invalid." Paulino v. Astrue, 2010 WL 3001752,

*21-22 (S.D.N.Y. 2010), adopted by Hon. Colleen McMahon, 1:08-CV-02813 [24] (August 20,

2010). "[F]ederal circuit courts have generally held that an ALJ may reject an IQ score as invalid

when it is inconsistent with the record." Juckett ex rel. K.J. v. Astrue, 2011 WL 4056053, *7

(N.D.N.Y. 2011), adopted by 2011 WL 4055296 (N.D.N.Y. 2011); Vasquez-Ortiz v. Apfel, 48

F.Supp.2d 250, 257 (W.D.N.Y. 1999) (Heckman M.J.) ("ALJ is not required to accept claimant's

IQ scores when they are inconsistent with the record"). Therefore, ALJ Mazzarella was not

bound by the IQ score contained in the previous disability determination, and I recommend that

the case not be remanded on this basis.

---

[16]     "Even if an individual has at one time qualified for benefits . . . , the Secretary may
suspend disability benefits if he concludes that the disability ceased. Under the Act, a disability ceases,
*inter alia*, when an individual is engaging in substantial gainful activity." Barber v. Sullivan, 765
F.Supp. 58, 63 (W.D.N.Y. 1991) (Skretny, J.).

**G.      The Commissioner Did Not Err in Finding Plaintiff Did Not Meet or Equal One of
         The Listings**

Plaintiff argues "[i]n this case the Plaintiff's impairments clearly meet the [Listing

12.08]." Plaintiff's Memorandum of Law [28-1], p. 9.  The Commissioner  responds that ALJ

Mazzarella properly determined that plaintiff's impairments did not meet or medically equal a

Listing.  Commissioner's Reply Memorandum of Law [29], pp. 7-8.

The third step of the sequential evaluation process asks whether, the claimant has

an impairment listed in Appendix 1.  If so, the Commissioner must find  the claimant is disabled.

20 C.F.R. §404.1520(a)(4)(iii).  In his opinion, ALJ Mazzarella concluded that "claimant's

mental impairments, considered singly and in combination, do not meet or medically equal the

criteria of listings 12.04 and 12.05" (T19).  Instead of challenging whether he met Listings 12.04

and 12.05, plaintiff argues that ALJ Mazzarella erred in determining that he did not meet Listing

12.08.  Plaintiff's Memorandum of Law [28-1], p. 9.

"In considering whether a claimant's condition meets or equals a listed

impairment, the ALJ must discuss the listing by name and offer more than a perfunctory analysis

of the listing." Cain-Wesa v. Astrue, 2012 WL 2160443, *16 (E.D.Wis. 2012) ( *citing* Barnett v.

Barnhart, 381 F.3d 664, 668 (7th Cir. 2004)). "Failure to mention specific listings, if combined

with a perfunctory analysis, may require a remand." Id. (*citing* Ribaudo v. Barnhart, 458 F.3d

580, 583 (7th Cir. 2006)).

Although Dr. Mohan's Psychiatric Review Technique expressly addressed

whether plaintiff met Listing 12.08 (T318), this Listing is not addressed by name  in ALJ

Mazzarella's opinion.  Nevertheless, I conclude that there is no basis to remand the case to ALJ Mazzarella based upon his failure to mention Listing 12.08.

To meet Listing 12.08, plaintiff must satisfy the criteria of paragraphs A and B. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.08.  Paragraph A requires "[d]eeply ingrained, maladaptive patterns of behavior associated with one of the following: 1. Seclusiveness or autistic thinking; or 2. Pathologically inappropriate suspiciousness or hostility; or 3. Oddities of thought, perception, speech and behavior; or 4. Persistent disturbances of mood or affect; or 5. Pathological dependence, passivity, or aggressivity; or 6. Intense and unstable interpersonal relationships and impulsive and damaging behavior."  Id.  Paragraph B requires the behaviors established in paragraph A to "[r]esult[] in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration."  Id.  The criteria of paragraph B of Listing 12.08 is the same as the requirements of Listing 12.04 (B) and 12.05 (D).

In assessing the criteria of Listings 12.04 and 12.05, ALJ Mazzarella concluded that plaintiff has "mild restriction" in activities of daily living, "moderate difficulties" in social functioning, "moderate difficulties" in regards to concentration, persistence, and pace, and "no episodes of decompensation, which have been of extended duration" (T19-20).  Since plaintiff fails to offer any evidence that would establish "marked difficulties" or episodes of decompensation sufficient to meet the criteria of paragraph B of Listing 12.08,  I recommend that the case not be remanded on this basis.

**CONCLUSION**

For these reasons, I recommend that defendant's motion for a judgment on the pleadings [26] be denied, and that plaintiff's cross-motion for judgment on the pleadings [28] be granted in part, and denied in part, and that the case be remanded to the Commissioner for further proceedings consistent with this opinion.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by January 23, 2014 (applying the time frames set forth in Fed. R. Civ. P. ("Rules") 6(a)(1)(c), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**SO ORDERED**.

DATED:   January 6, 2014

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge